Hear ye, hear ye, this Honorable Appellate Court for the 2nd Judicial District is now open. The Honorable Anne B. Jorgensen presides. Please be seated. Your Honors, the first case on the docket this morning is 2-22-0437, Cynthia Edwards, Plaintiff Appellant. The Commuter Rail Division of the Regional Transportation Authority, City of Elgin, Metro-Pace Suburban Bus Service, the Northeast Regional Commuter Railroad Corporation, Defendants Appellees. Arguing on behalf of the Appellant, Mr. Brad Skatefish. Arguing on behalf of the Appellees, Ms. Catherine Bassett-Wyra. Are both sides ready to proceed? Yes, Your Honor. Counsel, when you're ready. Please. And as you know, these are being recorded, so please adjust the microphone to suit yourself. Okay, good morning. May it please the Court, Counsel, my name is Brad Skatefish. I am arguing on behalf of the Appellant, Cynthia Edwards. As the Court, I'm sure, is aware, Ms. Edwards was a homeless person. She was using... Why does that matter? I don't think it does, but it's in the facts. Why did you bring it up? Well, because it's focused on by the defense. They focus on her status as somebody who is using an area for what they consider to be an unintended purpose, that of public urination. And I think for explaining the background of the facts, the fact that she's a homeless person kind of bears out the fact that one who does not have a home may be forced to answer necessities such as urination in public places at times. The important thing, though, is that she was using a paved area, an area that paced bus users, train riders, people going to other tracks, people taking a break to smoke, customers of nearby businesses. So she was on a paved area? She was. How did she fall on a paved area? Because obscured to her by foliage adjacent to it was a 10-foot hole with no protection. So she did pavement, then bushes, and then a hole. Right. How was going through the bushes an intended use? That's a good question, because the intended use was used by pedestrians, by people on foot. Cutting through the shrubbery? People used this on foot regularly. It was known. And she was the only person that fell, even though people regularly cut through those bushes? Well, we don't know that. She's the plaintiff in this case. She is a person. Right. But if it was someone using it all the time, and therefore it was an intended use, wouldn't someone else have fallen into a 10-foot hole? Well, it's possible they did. But even if no one else had, of course, in a lot of personal injury matters, the plaintiff is the first one to encounter the danger and actually have some danger before them. I guess my question is, if I landscape my property, am I intending for people to trample through it and walk through the bushes, walk on the bushes, walk on the plants? I guess that goes to your intention for that property and how you could fence it off. You could put up no trespassing signs. You could do certain things to try to keep people off of it. If it's generally open to people, you may have to anticipate that pedestrians will use that property. And I think that's the case here. One of the reasons I even opened by mentioning the status as a homeless person is they make an issue of that. She was homeless. She was looking for a place to publicly urinate. We would argue there's no difference between that and if she were there because, let's say, her train ticket blew out of her hand and blew into this paved area with foliage around it and she went to retrieve it. I think anybody would agree that's a reasonable use of that area because it's expected for human beings to walk upon. That's what she did. She encountered this unreasonable danger. It doesn't matter if she was there to get her train ticket, if she was there to ultimately do something that would be frowned upon or even be potentially against the law like public urination because she hadn't gotten to that point. She was on foot, which is expected use of the property. What in the record or describe for us, if you would, the relationship of the bushes in terms of distance to the concrete wall that you described and the 10-foot hole. I'm not sure the complaint, I don't think, says it's a 10-foot deep, 10-foot wide. I'm not sure it matters. I don't recall anything in the briefs that made that clear, but just from a logistical perspective. Logistically, we understand that it's a matter of feet once you get to the paved area where the foliage is two to three feet to the hole, which is roughly 10 feet deep. I agree that... There's a hole on the other, so there's pavement, bushes, 10-foot hole. Right, and it's still within a paved area. It's just difficult to see because of the foliage that surrounds the actual hazardous part. Wait a minute. Are you saying it's paved? If there's foliage growing, it has to be dirt, not paved. The foliage comes out of... The entire area surrounding it isn't all paved. There are parts that are and parts that are not. Again, I think, while I'm not trying to disagree with the panel, I think these are factual issues that would be more appropriate for the jury to hash out when they make an ultimate decision on whether there's liability in the case, not issues that should bear upon whether or not the case survives at the motion to dismiss state, which is what's brought us here today. The reason we look to the nature of the property itself... I'm sure you've read the briefs, and there's a lot I have to say, but two main things come down to. I believe my opponents would argue this case is analogous to Babbage, and we would argue that that's inaccurate, and this is far more analogous to the Gaston case. In the Gaston case, you had a group of teenagers who were cutting school, loitering in a parking garage. They had no car there. They had no legitimate purpose there. They were trespassers. They weren't using it for the purpose of parking a car or accessing some nearby business, but the teenager who was killed in this matter was going down a staircase on foot, and the appellate court found that the intended use of that area was to walk up or down the stairs to access the area that's nearby. It didn't matter that he may or may not have had any business established in the parking garage, at least as far as the complaint went. Right, and it sounds like from the facts of that case, they didn't have any legitimate business, and what they were ultimately up to was teenage no good, and it might be argued that my client was ultimately up to doing something that society would frown on that might have even violated certain laws, but at the time the incident happened, she was a teenager. But that does dovetail nicely with the idea that you look to the property itself. Right. So if you're looking at stairs and the person's walking, even if they weren't walking to go get their car in the garage, then it makes it more important for us here to know what was the nature of this property. Again, I'm hearing you say, I don't mean to harp on it, but wall, concrete, bushes, and then beyond that, a hole, which again, I don't know if it's 10 foot deep. I'm not sure. I only want to know what's in the record. Certainly the complaint, I can say, doesn't say 10 foot deep or 10 foot wide. It doesn't. It says 10 foot hole. So I guess I would focus on the fact that from the record, from what's been pled and has to be taken as true for purposes of today's proceedings and the motion to dismiss, there is a hole that's obscured on a paved area where people walk regularly. And that's what we think the focus is upon, that the intended use of this area is for walking. And it's known that it's used for that by a variety of types of people. What were the specific facts that were pled to show that this was intended to be walked on by pedestrians? It's pled that it's known to be used by Pace Bus users, other train riders, people going to and from certain tracks, people walking in nearby areas, customers of the nearby business. This particular spot. This particular spot. Smokers and other homeless and vagrant people that are seen on a regular basis. They're there. They're on foot. And, again, I keep coming back to that because it is an important distinction. That's why this case is like Gaston and not like Babbage, because the Babbage case had to do with an individual who encountered a danger in a crosswalk while riding their bike across. And what the court hung its hat on was that, well, bicyclists might be expected or permitted users. They weren't really the intended users. The intended users were the vehicles and the people walking across the crosswalk in the perpendicular direction to this person for the purpose that the road was designed for. In this case, she wasn't on a bicycle or a skateboard or a roller blade or anything like that. She was on foot, which was the intended purpose of the area. So if the defense wanted to keep people out of it, they could have fenced it off. They could have put up signs. Those things weren't done. And, again, I think – Well, isn't putting up bushes sort of an offense? I would argue that there's nothing in the record that suggests there are anything other than decorative to beautify the area. And she didn't have to crawl under bushes or push them away. She just went into an area that was partially obscured by the bushes. So I think there's a distinction there. And, again, the area was used regularly. And that goes into one of the other arguments that's made by my opponent that, well, isn't this just trespassing? Well, even if it's trespassing, there's a frequent trespasser exception. And this fits under the facts, like Lee v. CTA, another public transit case, which talks about whether the trespass statute was designed to combat the harm that occurred. In this case, if they were to argue that this is trespassing, they're intending to keep vandals, other people who are doing things that aren't appropriate from being done on their property. What it's not intended to keep people from doing is falling into a hole. So there's – Isn't that willful and wanton conduct? Which I believe we've alleged. And so if it's willful and wanton conduct, that's – Tell me, point to exactly what you're – Can I ask that same – because I went through it line by line comparing, and I only saw the facts were all the same. The only difference was that willful, wanton versus negligent. Is there something – Otherwise, in my reading, in a close reading, identical. Well, and I think there can be because willful and wanton under the law of Illinois is essentially an enhanced version of negligence. So the facts can be identical. The argument is that you're proving to the jury that it – What's the enhancement? If the same allegations apply to both, then why have a distinction? Well, one argument that would ultimately be made to the jury is this meets the standard of the reasonable person. This is something a reasonable person wouldn't do. And one is that it – they know the danger. This is an unreasonable danger that crosses into recklessness or willful and wanton conduct. It's – that is something for the jury to determine whether it meets that standard. But in this case, we have pled that it meets that standard, that this is – That's back to the same question. What is it that you pled apart from the negligence that establishes willful and wanton at the pleading stage? That the defendant was aware that people use this place regularly. Not on occasion, not one or two people sneaking through. Also that it was a small, discrete piece of land, and that's something that the case law that interprets the frequent trespasser definition gets into. We can't – you can't protect against trespassers necessarily if you have something that's acres big, but when you have a small area where you know that trespassers habitually enter at a particular point and traverse the area, you can still be held liable. And we believe this squarely meets that definition because we're not talking about a large area. And the area that people have been seen in as pled in the complaint is this specific area, that it happens with some regularity. Okay. And there was some allusion to ALO, by the way. The use of the property by, I think, the complaints, it's something like customers of other businesses use it as a point of – I don't know if this is your word or mine – egress to – from one street to another. Right. I'm not sure if the complaint was specific about how – about the relationship between the point of the fall and the point of this, you know, we'll call it a back way, if you will. Okay. Is the complaint specific about the spatial relationship between the point of the fall and the point of this alleged back way? I believe the complaint alleges that this area is part of the area used by customers. I guess I wonder if that – how could that be if there's a 10-foot hole? Well, it's – the entire area isn't the hole. The area is a paved area with an adjacent 10-foot wall that constitutes the danger immediately next to an area that's frequently used. On the other side of the bushes. It's hard without pictures. In the vicinity – Is there a picture in the record or not? I don't believe that there is one that fully would show the spatial layout. I could be wrong on that, but I don't think there's one that would put you there as if you were seeing it firsthand. But with that being said, again, this is a motion to dismiss of the complaint. I think the allegations of the complaint that this is an area used by customers of the adjacent businesses, used by people just hanging out while they're waiting for a train, talking on their phone, smoking a cigarette. Well, to the extent that that relationship isn't, you know, explicated by the complaint, it's – I mean, it's kind of your burden to plead this. I guess what I'm saying is I think we have pleaded. If they were to argue that, well, in fact, the people just pass nearby, but they're not exactly – well, that's not what the complaint says, and that's not what the burden is here. The complaint says that people use that area, and that's what we believe to be true. That area, but what is the relationship between the area, the byway, the backway, and the point of the fall? I am not sure, but I'll read it again, and I think your point is a good one, counsel. It's the complaint. I'll read it again, but I'm not recollecting exactly that relationship now. And I did read it closely. And, you know, like most areas we encounter in real life, it's not as if there's a, you know, a painted bright line that says now you've entered this area, now you're not in the area. It's an area. It's spatial proximity that people encounter and need to encounter and frequently do. Okay. Counsel, I'll give you a minute to make your final point here. You do, of course, have a chance for reply. Okay. I think I've gotten through most of what I want to say. I just really think the focus is looking at the complaint and then looking back to the Gaston case. We believe we're on fours, on all fours, with the Gaston case. That a person perhaps had a legitimate purpose to be there, but on foot, which is the intended purpose of this area, knowing that the focus of the case law has to be on the intended use of the area, not on the plaintiff's particular intended purpose. We believe we meet the standard, and the ruling of the trial court should be reversed. Thank you. Thank you. Counsel? Good morning, Your Honors. May it please the Court, my name is Catherine Weiler. I represent METRA in this matter. Step up a little closer, because, again, because it's being recorded, and we'll make sure that there's a clear voice. Very good, Justice Jorgenson. If it's not, let me know. That's better. My name is Catherine Weiler. I represent METRA in this appeal. We are asking that the Court affirm the circuit court's ruling in METRA's favor. There are a handful of reasons this Court should affirm, but I'd like to start with the questions that the Court has been asking counsel this morning, and that relates, Justice Mullen, I know, to the complaint you've been saying that I realize, and I realize you've been reading it very closely, but I think it's worth looking at the specific allegations in the complaint, because that speaks directly to what I believe are both of your concerns. These are on pages 201 and 202 of the record. I believe the relevant paragraphs in this is the second amended complaint. The relevant paragraphs are paragraph 7, and then on the next page, paragraph 12. Those are the only things in the complaint that describe this area to the Court, Justice Jorgenson. To your question, no, unfortunately, there are no photographs in the record, but I would that there were, because the description is somewhat different than what we've been hearing. This area, as described in the complaint, is a narrow area between a tall concrete wall. On the other side of the wall is a road and the Pace Bus Station. So we're talking about... And I don't mean to be a stickler, but does it say tall? I believe it does, but, Your Honor... I'll check. And, Your Honor, I confess that I found a photo on Google Maps, which I realize is not before the Court, so I'm not suggesting that it should be. But I apologize to the Court because that may bleed into my description. I understand. And that's not intentional. I will look at the complaint. Thank you, Your Honor. But there's a concrete wall. There is a narrow space, and that's how it's described in the complaint. Again, this is paragraph 12, obscured by foliage without barricades. And that's the space that we're talking about that is not lit. And it's described that way as well. Not well lit, and at night the hole was impossible to see. So that's the description, to be clear. That's the description in the complaint. There is a suggestion in the complaint about maybe others using this area as a throughfare or others walking in the area or others using... That's paragraph 7. It's not the exact same space. Your Honors have been asking that question, and that's fundamental to this Court's analysis of how the Tort Immunity Act plays into a determination of duty here. Because it's not just a question of whether the space writ large is somehow accessible or is somehow intended for use by the public. And incidentally, it's not. There is a public crossing. There is a road where you can cross over the train tracks. The tracks run through the middle of this space. I don't think Plaintiff is suggesting that individuals are supposed to be walking in the middle of the train tracks, which is part of this area. You cannot look at the entire area and suggest that it is intended and permitted that members of the public be anywhere in this space at all times. That simply cannot be, because were that the case, then things like the Transportation Act would have absolutely no meaning in this State. And that's not true either. So the Court has to look at the specific area that's at issue in the allegations. And that specific area, again, as you know Justice Mullin painfully, is described in paragraph 12 of the Second Amended Complaint. That description does not speak to a space that the City or that Metro, particularly here, would intend and permit individual members of the public be using for any purpose. That space is not intended for walking. That's why there are bushes. That's why it's not lit. That's why it is, as the complaint says again, quote, obscured by foliage. That is not a walking path. That is something entirely different. And Justice Jorgensen, to your point, if you're a homeowner and you have bushes immediately adjacent to your home, that is not some sort of an invitation that the public can walk through that space. That's not the purpose. So what does this Court look to? The same thing that the Circuit Court looked to correctly, and that is in considering whether there is a duty owed under the Tort Immunity Act, did the plaintiff, was she a permitted user of that space, and was she an intended user of that space? The Second Amended Complaint does not make allegations that are sufficient to speak to that. Now beyond that, this Court can even consider a more fundamental problem that exists from the allegations in the Second Amending Complaint, and that is the admission that Ms. Edwards was a trespasser. She was a trespasser in this space. This Court doesn't even need to get into analysis under the Tort Immunity Act because there is already an admission that she was trespassing. Let's go to the frequent trespasser. Yes, Your Honor. First of all, as we explained in our response brief, that was not argued. In the opening brief, there was argument about trespass. There was not argument about the frequent trespass doctrine, so that's been forfeited. And that's important because this is the first time we've had the opportunity to address that. This is the second time. Right now, this morning, forfeiture, of course, is a limitation on you but not us. That's true. So we'd like to address it. Absolutely, Your Honor. I'm happy to do that because this is not a situation that would involve, that would implicate the frequent trespass doctrine. The frequent trespass doctrine necessarily involves a situation in which the specific area that we are talking about is an area that the defendant knows is being frequently used by members of the public. It's a doctrine that is not implicated very often because there needs to be something very, very clear. For example, a beaten path. That's the example that's often used. But one of the more recent cases that I was able to find that talks about the frequent trespass doctrine is a case called Epple v. LQ Management. It's 2019, Ill App First, 180853. Paragraph 20, I believe, is what would specifically address the question of whether there could be a frequent trespass doctrine here. It is necessary that the possessor of land know, or from facts within his knowledge should know, that persons constantly and persistently intrude on some particular place on the land. It is not enough that he know or have reason to know that persons persistently roam at large over the land. And that comes back to fundamentally, Justice Mullen, what you have been asking about the description that exists in the Second Amended Complaint. There is an out, there are statements in the Second Amended Complaint suggesting that METRA knew or should have known that people were in different places on the area around those tracks. There is not an allegation that people were consistently behind the bushes such that it would implicate the frequent trespass doctrine, such that METRA knew or should have known that this was happening so often that it needed to take some sort of action to address it. And there is no allegation that METRA actually could have done something about it. Again, Epples states this, tolerance of trespassing is not tantamount to permission. And that is a fundamental distinction as well. There is no requirement under the law to take on burdensome and expensive precautions against intrusion. Choate speaks of this too, the Illinois Supreme Court's decision in Choate in which the Illinois Supreme Court was addressing the idea that a trespasser is not owning duty of care, including specifically when we're talking about space that is owned or operated by railroads. And that's what we're talking about with METRA here. So in Choate, for example, there was no requirement that the railroad put up a fence to control access at every single point along those tracks. And there couldn't be. And that was the point of the Illinois Supreme Court. That's different. Related to trespass, for sure. But this has not got anything to do with the tracks. Agreed. But the space does. The area does. Because we're talking about the area around the train tracks. That's the point. This area that we are talking about, it's the area adjacent to METRA's tracks, to the train tracks right there. That's the key point. And that's why we can establish that Ms. Edwards was a trespasser. And I recognize the Court's questions relate to frequent trespass doctrine. But that's the distinction here. That's why it's an important point. And Choate is actually applicable to understanding that concept of exactly what are the obligations in a frequent trespass case. They certainly did not exist here. I realize my time is starting to run short. I'd like to address one last thing, if I may, and that relates to Wilhorn-Wanton because the Court was asking some questions about that. The Court is exactly correct. These allegations in the Second Amended Complaint, the allegations of negligence, there are no additional allegations that suggest any sort of Wilhorn-Wanton conduct. And that simply is not sufficient under the law. I believe we cite this in our papers. It's West Bend Mutual Insurance Company. It's this Court's case, 2021, ill-at-second, 210108, at paragraph 39. You need to allege deliberate intention to harm or utter indifference to or conscious disregard for plaintiff's welfare. That needs to be alleged. I'll say that again. It needs to be in the complaint. And that is not here. There is no sufficient allegation as a matter of law of Wilhorn-Wanton. The last point I'd like to make to this Court is simply regarding the Gaston case or Gaston case. It's too many hearings of Beauty and the Beast with my children. I'm sorry, Your Honor. It is an entirely different situation than Gaston for a couple of reasons. First and foremost because, as you were saying, Justice Mullen, in Gaston, the plaintiff was walking down the stairs. We're not talking about a situation in this case where the plaintiff was walking on a sidewalk. That's where we come back again to the description in the Second Amended Complaint. This was not simply a pedestrian. This was a person who was intentionally looking for a discrete area of the property. That's what she was trying to find. A discrete area is not an area in which the public is being encouraged to walk or traverse. And that's the difference between the two cases. It is also worth noting there's a lot of discussion in the papers about trespass related to Gaston. In Gaston, there was a specific city ordinance that addressed that. The public parking garage was specifically accessible to the public. That's what the city ordinance said. So there could be no trespass because there was a city ordinance that precluded a finding of trespass. So it's not the same situation. It's not an analog to this case where the allegations in the complaint here speak to a description of a narrow, obscure space that was sought out for privacy but was not intended to be accessible to any members of the public. The plaintiff was not supposed to be there. She was a trespasser. Beyond that, she was not an intended and permitted user of that space. The circuit court correctly made that determination, and we ask that this court affirm that finding. Do we look at the nature of the injury caused by the nature of the defect in the property here? We don't. We look at, or I should say the court, Your Honor, looks at the intended use that METRA had for that property. What was the intended use? There was not, because of the description, again, that we're given. I realize we keep coming back to that, Justice Mullen, but that's the point. The description that we are given, a 10-foot hole next to a concrete hole that was obscured by foliage without barricades, that is, the intended use of that is not for the public to be in that space. Again, Justice Sorgenson, that's your question. That's not intended use, and intended use is the question that needs to be permitted and intended. There can't be an intended use for the public of that space based on the description we're given. If there are no further questions? Any other questions? I have no other questions. Thank you, Your Honors. Counsel, do you wish to reply? Thank you. I appreciate it. Sure. I want to reply to a couple of the comments that counsel made. One of her early arguments was, well, this was not the exact same space used by those bypassers and those other individuals who would cut through or use it. As I mentioned before, there is no bright-line delineation, and I know you'll reread the complaint. We've alleged that it is essentially the same space. To use counsel's words, this is not the train station writ large. This is not a large area of acres or hundreds of square feet. This is a small area that we have alleged is one and the same as the area that people cut through, that people hang out in, that vagrants use, that loiterers use, and it's known. And it is adjacent to the tracks. Correct. It is by the tracks, but it is not. One wouldn't need to step on the actual tracks themselves. And I think that's an important thing because she mentioned next, well, we know that a person's not supposed to be walking on the train track. Well, this isn't specifically the train tracks. And that, there would be a bright-line delineation. Somebody can tell when they cross from an area near train tracks to the area where there are the metal rails. There are the rocks that surround the rails. There are the other things that are built up that are clearly part of the area. This is for a train to pass. Might a human being ever walk over it? Possibly, but that is very clearly not the intended use of a train track. Whereas, this is an area, a paved area. Again, what's the purpose of pavement? It's generally either for walking upon or driving upon, and this is not a driving area. It's an area intended for human beings to walk upon. Counsel made a big issue of the trespasser status and whether we had pled in the opening brief the frequent trespasser doctrine. First, the reason that's not brought up is our focus in the appellant brief was status as trespasser is irrelevant under Gaston. Gaston made the conclusion that these individuals were trespassers. That's right, but she also just alluded to there was a city ordinance in place that might have affected the outcome of that. It had to do with the status, whether it's by city ordinance or by general understanding. In that case, the plaintiff's, or the plaintiff's decedent, was considered by the court to be a trespasser. Our argument is this case is on all fours with Gaston whether you consider Cynthia Edwards to be a trespasser or not because the logic of that case still applies. What about the argument that the young man in Gaston was walking on stairs, something that pedestrians walk on? Right. Here, walking adjacent to the tracks in an area that was obscured, to use your words, by foliage. How is that the same? It's the same because she accessed that walking on a paved area and fell into a hole that she didn't see. Well, I've asked you that a couple times. Sure. Paved area, hole. What's between the paved area and the hole? As you cross between the bushes, but again, without having to crawl under or climb over, you encounter the hole and she fell into it. If it were a fence that someone could step over, is there a difference? I think there is a difference there because a fence has a very clear and intended meaning. Unless we're talking about a fence that's 18 inches high and they know that people walk right over it every day, then that may give rise to different duties because they're aware. In terms of the frequent trespasser doctrine... The height of the bushes isn't in flood, is it? I'm sorry? The height of the bushes isn't in flood. We just know that it obscured what was behind it. It obscured the view, yes. As to whether or not frequent trespasser was pled in the opening brief, again, the focus of our opening brief is that status as trespasser is itself irrelevant. I think the appellant is still afforded a reasonable opportunity to respond or reply to the arguments made by the defense, and this is an appropriate, responsive argument. You'll give it the weight it deserves, and I know you'll look back at what's in the record. I believe it did come up at certain points in the trial court, regardless of whether it was in the opening brief, and I'll leave that to the court to determine what weight that particular argument deserves. As to Rule Form 1, when counsel brought up the definition, she really seemed to focus on the first part of the traditional definition, that of deliberate indifference, which I would agree there probably isn't deliberate indifference, but conscious disregard is the second part of that clause, and I think that is what's borne out by the allegations, that if you know that people use something on a regular basis, especially some of them being homeless and other disadvantaged people, and you don't do anything about it, while you know that they're likely to encounter this harm, it can be held liable under the Willful and Wanton standard, and the mere fact that the term conscious disregard may not have been pled is irrelevant. That would be a conclusion. One doesn't have to use the word negligence to make out a negligence complaint, and in fact, if that's all you do, you've just made a conclusory plea. So if you'd like me to wrap up, I'll just make a final comment. Counsel says, you know, this is different from Gaston. We say it really isn't. It's somebody who may not have had a legitimate purpose to be somewhere, but they were using the space as it was intended, which is to walk on it as a pedestrian, and they encountered the unreasonable dangers. So under the Gaston holding, we feel that the trial court's ruling should be reversed. Thank you. Well, thank you both very much for your arguments this morning. We will take the matter under advisement and issue a decision in due course. We will be in recess until our next argument, which I believe is 11 p.m.